UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

EDWARD J. CHUNG,

                Plaintiff,

    -against-

PROVIDENT LIFE AND CASUALTY
INSURANCE COMPANY,

                Defendant.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW
FOLLOWING A BENCH TRIAL**

21 Civ. 9344 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiff Edward Chung filed this action alleging that Defendant Provident Life &

Casualty Insurance Company ("Provident Life") improperly terminated his disability benefits

under an Individual Disability Income Policy in violation of the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.  See* Compl., ECF No. 1.  On August

17, 2022, the parties agreed to resolve their dispute with a bench trial on a stipulated

administrative record pursuant to Federal Rule of Civil Procedure 52.  *See* ECF No. 15.  On July

12, 2023, the parties appeared before me for a bench trial.  For the reasons identified in the

below findings of fact and conclusions of law, judgment is entered in favor of Chung.


### FINDINGS OF FACT[1]

### Edward Chung's Disability Insurance Policies

---

[1] These findings of fact are based on the parties' stipulated record. See Fed. R. Civ. Pro. 52(a)(l)
("In an action tried on the facts without a jury . . . the court must find the facts specially and state
its conclusions of law separately.").

1.      Plaintiff Edward Chung is a 56-year-old attorney who last worked on December 31, 2018 as a Mergers and Acquisitions ("M&A") Partner at Simpson, Thacher & Bartlett, LLP ("Simpson Thacher").  R. at 4105-06.[2]

2.      Chung had worked at Simpson Thacher for approximately 26 years and had specialized in high-profile, international M&A work.  *Id.*

3.      As a Partner of Simpson Thacher, Chung received income protection to insure against the possibility of long-term disability from his occupation through a standard Group Plan and a Supplemental Plan.  *Id.* at 120-54; 3776-99.  Both Plans are subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, *et seq.*  *Id.* 148-54.  Both Plans, although insured by different subsidiaries of Unum (First Unum Life Insurance Company and Provident Life and Casualty Insurance Company, respectively), are administered by the claims and appeal staff at Unum Group ("Unum").  *Id.* at 1471-75; 3723-32; 5332-38; 6498-511; 6615-16.  Chung was additionally the beneficiary of an individual disability policy written by Northwestern Mutual.  *Id.* at 4130.

4.      The Supplemental Plan provides a level of coverage beyond the basic coverage provided by the standard Group Plan.  *Id.* at 3776-99.  Partners of the firm, including Chung, were permitted to purchase and pay for this premium coverage.  *Id.*  It is a separate Plan, solely between Provident Life and Chung, with distinct terms and conditions.  *Id.*

5.      The Supplemental Plan defines "Total Disability" or "Totally Disabled" as follows:

Total Disability or Totally Disabled means that because of Injuries or Sickness:

a.  You are unable to perform the material and substantial duties of

---

[2] I reference the stipulated record according to the bates stamps provided in the November 10, 2022, and February 24, 2023, affirmations of Jennifer Hess.  *See* Hess Aff., ECF Nos. 25, 37.

Your Occupation; and

b. You are not engaged in any other occupation; and

c. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

After the end of the Your Occupation Period, then Total Disability also means:

d. You are unable to perform the material and substantial duties of Any Occupation.

*Id.* at 3785.

6.      The Supplemental Plan defines "Residual Disability" or

"Residually Disabled" as follows:

Residual Disability or Residually Disabled means that You are not Totally Disabled, but due to Injury or Sickness:

1. You are unable to perform one or more of the material and substantial duties of Your Occupation; or You are unable to perform them for as long as normally required to perform them; and

2. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You.

After the end of the Elimination Period, Residual Disability or Residually Disabled also means:

3. You incur a Loss of Earnings while You are engaged in Your Occupation or Any Occupation.

*Id.* at 3784.

7.      The Elimination Period in the Supplemental Plan is 365 days. *Id.* at 3789.

This is the number of days that the insured must be totally or residually disabled as those terms

are defined and otherwise eligible to receive benefits before benefits can be paid.  Benefits are

not paid during the elimination period. *Id.*

8.      The Supplemental Plan defines Your Occupation as: "the occupation or

occupations, as performed in the national economy, rather than as performed for a specific

3

employer or in a specific location, in which You are regularly engaged at the time You become Disabled." *Id.* at 3785.

### Chung's Disability

9.      Several years ago, Chung began to experience pain in his neck and upper back, which radiated with numbness and tingling to his upper extremities. *Id.* at 4110. His symptoms worsened over time. *Id.* 2177-78. By 2017, Chung's symptoms made it difficult for him to sit, keep his neck in static position, and type on the computer for long hours. *Id.* at 4109-11.

10.     In January 2018, Chung saw Dr. Saad Chaudhary, a spinal surgeon, who diagnosed Chung with cervical spondylosis[3] with C5-C6 disk degeneration. *Id.* at 302-03. Following that diagnosis, Chung reduced his billable hours at Simpson Thacher, recording an average of 84.3 hours per month in the first six months of 2018. *Id.* at 340. In contrast, Chung billed an average of 158.55 hours per month in 2017. *Id.*

11.     Chung began seeing Dr. Marc Levinson, a Physical Medicine and Rehabilitative Specialist, in April 2018. In June 2018, Dr. Levinson recommended that Chung restrict his "work to 4 hrs/day," stating that Chung could not "sustain position in front of computer for extended periods." *Id.* at 62, 4118.

12.     In the second half of 2018, Chung determined that he could no longer work at Simpson Thacher given his condition. He prepared to depart from the firm by winding down his responsibilities to facilitate a smooth transition of his clients, workload and duties. *Id.*

---

[3] Cervical spondylosis is a general term for "age-related wear-and-tear affecting discs in the neck." *Talavera v. Comm'r of Soc. Sec.*, No. 06-CV-3850 (.1G), 2011 WL 3472801, at *4 n.8 (E.D.N.Y. Aug. 9, 2011).

at 4119.  In the second half of 2018, Chung billed approximately two hours per day or less.  *Id.*
4118.

      **13.**    On December 31, 2018, Chung retired from Simpson Thacher due to his
condition.  *Id.* 4119-20.  He has not worked in any capacity since December 31, 2018**.**

<u>**Chung's Application for Benefits**</u>

      **14.**    In mid-2018, while still working at Simpson Thacher, Chung applied for
disability benefits under both the Group Plan and the Supplemental Plan.  On his initial claim
form, Chung identified his condition as "extreme pain, numbness/tingling in fingers and arms."
*Id.* at 52.  He stated that the onset of his condition was January 1, 2017, and that he had first been
treated by a physician for the condition on January 25, 2018.  *Id.*

      **15.**    Based upon the initial medical information supplied, Provident Life
determined that Chung's date of disability was January 25, 2018.  Defendant invited Chung to
submit additional information regarding disability back to July 2017.  *Id.* at 1471.

      **16.**    Payment of benefits under the Group Plan commenced effective July 24,
2018.  *Id.* at 1472.  Benefits were not yet payable under the Supplemental Plan due to its 365-day
elimination period.  *Id.*

      **17.**    On November 27, 2018, after review of additional medical information,
Chung's date of disability was adjusted to July 21, 2017.  *Id.*1603.  The elimination period under
each policy was adjusted to that date, and Chung began receiving residual disability benefits of
$20,000 per month under the Supplemental Plan commencing July 21, 2018.  *Id.* at 1603-1604.

      **18.**    On January 31, 2019, after being advised of Chung's retirement, Provident
Life began assessing his eligibility for ongoing benefits while it continued paying disability

benefits. *Id.* at 1641.  Provident Life requested information from Chung through his counsel, and Chung submitted:

      a.  A Functional Capacity Evaluation dated March 14 and 15, 2019, *id.* at 1845-77;

      b.  A Narrative Report from Dr. Levinson dated May 10, *2019, id.* at 1924-27;

      c.  A letter from Dr. Levinson's dated May 22, 2019, *id.* at 1923;

      d.  A Residual Functional Capacity Questionnaire from Dr. Levinson dated May 22, 2019, *id.* at 1928-32;

      e.  A vocational evaluation from Dr. Daniel Wolstein dated June 20, 2019, *id.* at 1949-87; and

      f.  Office Visit Note from Dr. Levinson dated September 11, 2019, *id.* at 2146-47.

**19.**    In October 2019, a Provident Life representative interviewed Chung at his attorney's office. *Id.* at 2123-24.  During the 86-minute interview, Chung rose from his seat three times to relieve pain symptoms. *Id.*

**20.**    On January 3, 2020, Provident Life requested that Chung appear for an independent medical examination. *Id.* at 2323.  He appeared for that exam on March 10, 2020.

**21.**    On September 24, 2020, Provident Life denied Chung's claim for additional benefits under the Supplemental Plan, effective September 21. *Id.* at 3723-24.  As its reason for the denial, Provident Life stated that it had determined Chung was able to perform the duties of his occupation on a part-time basis. *Id.* at 3724.  Provident Life further stated that the Supplemental Plan provides for residual disability benefits only while Chung is engaged in his

occupation or any other occupation, and because Chung retired on January 1, 2019, residual benefits were no longer payable. *Id.*

22.    Chung appealed Provident Life's decision on February 26, 2021. *Id.* at 4055. Provident Life re-evaluated its decision at the claim level, rather than through its appeal review process, and on June 1, 2021, Provident Life again denied Chung's claim. *Id.* at 5332. Chung appealed. *Id.* at 6379.

23.    Dr. Barry Gendron, board certified in Physical Medicine and Rehabilitation, reviewed Chung's appeal on behalf of Provident Life. Dr. Gendron concluded that the "medical file information does not support restrictions and limitations that would preclude" the physical demands of an attorney in the national economy. *Id.* at 6444. Dr. Gendron determined that that the evidence did not support a finding of myelopathy, cognitive impairment, impairing tremor, or impairment due to buttock/lumbar pain. *Id.* at 6452-44. While he found evidence supporting mild radiculopathy, he opined that the evidence did not indicate that Chung's condition would preclude part time work. *Id.* at 6452. He also stated that Chung's "reports of [his] inability to perform functional activities are in excess of the clinical findings." *Id.* at 6454. Dr. Gendron did not review Chung's MRI films, instead basing his opinion of the MRI results on radiological reports. *See* Trial Tr., ECF No. 42, at 22:1-15.

24.    On October 11, 2021, Provident Life issued its final determination, upholding its initial findings. R. at 6498.

### The Medical Evidence

Diagnostic Testing Results

25.    Chung's condition is documented by diagnostic testing, including repeat MRI, EMG, and X-ray results. *Id.* at 305; 308; 2295-96; 2297-301; 4634; 6390-91. The

7

results of these tests demonstrate progressive pathology involving Chung's cervical spine, resulting in radiculopathy affecting Chung's upper extremities. *Id.* at 2297-301.

26. The results of Chung's first cervical spine MRI, dated February 6, 2018, were abnormal, demonstrating protruding discs at C3-4, bulging disc at C4-5, and disc osteophyte complex at C5-6 with some impingement on the spinal cord. *Id.* at 305; 4092. There was also a bulging disc at C6-7. *Id.*

27. A 2017 X-ray showed "moderate C5-6 disc space narrowing with associated degenerative changes," while another X-ray in 2019 demonstrated "severe degenerative change at the C5-6 level," together with "straightening of the normal lumbar lordosis." *Id.* at 308; 4634.

28. In 2019, Chung, noting neck pain radiating with numbness and tingling to both upper extremities, underwent an EMG of the upper extremities to determine the severity of cervical spine radiculopathy and differentiate from plexopathy, neuropathy, and carpal tunnel syndrome. *Id.* at 2297-301. The EMG results, dated December 9, 2019, demonstrated evidence of active denervation and radiculopathy on the right at C5, C6, and C7 and on the left at C7. *Id.* at 2297-99; 4092; 4096. These EMG abnormalities revealed physiologic progressive changes as noted by nerve root compromise at multiple levels of the cervical spine where previously there had been none. *Id.* at 4096.

29. Chung underwent a repeat MRI in 2019 to evaluate spinal cord dysfunction. *Id.* at 2293; 2295-96. The results, dated December 4, 2019, were objectively abnormal. *Id.* at 2296. The MRI indicated a significant progression and deterioration of structure and function of the cervical spine with multiple areas of spinal cord involvement and flattening which a year and a half previously had not been present. *Id.* at 2295-96. The results

showed cervical spinal deterioration consistent with Chung's complaints and clinical

presentation. *Id.* at 2293; *see also* 4089-103. For example:

    a. The 2019 MRI scan showed a protruding disc with the disc-osteophyte

       complex at the C3-4 region producing flattening of the spinal cord. *Id.* at

       4089-103. This was not present on the 2018 MRI. *Id.* at 305.

    b. The 2019 MRI scan showed a disc-osteophyte complex at C4-5, whereas

       in 2018 there had only been a bulging disc. *Id.* at 4096.

    c. The 2019 MRI scan showed a protruding disc at C6-7 with flattening of

       the spinal cord, whereas in 2018 there had only been a bulging disc. *Id.*

       at 4096.

    d. The 2019 MRI scan showed a disc-osteophyte eccentric to the right

       flattening the spinal cord and severe right neuroforaminal narrowing where

       there had only been mild spinal cord impingement and no severe

       neuroforaminal narrowing in 2018. *Id.* at 4096.

    **30.** Chung underwent another repeat MRI in 2021 that demonstrated

continuing multilevel degenerative changes, most pronounced at C5-6, and further

progression at C4-5 with new right-sided herniation. *Id.* at 6390-91.

Abnormal Clinical Findings

    **31.** Abnormal clinical findings of Chung's cervical spine include decreased

cervical range of motion (*Id. at* 313; 486; 1538-39; 1658; 1826; 2202; 2147; 2207; 2441;

2451; 3693; 4095; 4593; 2292; 4949-50; 6611); cervical muscle tightness/tenderness (*Id.* at

310-13; 486; 1538-39; 1658; 1819; 2147; 2202; 2207; 2292; 2432; 2451; 3693; 4593; 4949);

upper trapezius tightness (*Id.* at 310-13; 486; 1538- 39; 1658; 1819; 2147; 2202; 2207; 2432;

2451; 3693; 4593; 4949); right interscapular area tenderness (*Id.* at 486; 1538-39; 1658; 1819; 2147; 2202; 2207; 2292; 2451; 3693; 4593; 4949); cervical muscle spasm (*Id.* at 1819; 2292; 2432; 4095); positive Spurling's sign (*Id.* at 303; 6604); positive Hoffman's sign (*Id.* at 6611); spinous process tenderness at C5-C7 (*Id.* at 6604); spinal muscle tenderness at C5-T1 (*Id.*); decreased trunk strength and range of motion (*Id.* at 1826; 2441); severe cervical/neck pain (*Id.* at 4095); muscle spasms (*Id.* at 1819; 2292; 2432; 4095); tenderness to palpation (*Id.* at 310-13; 486; 1538-39; 1658; 1819; 2147; 2202; 2207; 2292; 2432; 2451; 3693; 4593; 4949; 6604); decreased range of motion (*Id.* at 313; 486; 1538-39; 1658; 1826; 2147; 2202; 2207; 2292; 2441; 2451; 2700; 3693; 4095; 4593; 4949-50; 6611); weakness (*Id.* at 310-13; 486; 1538-39; 1658; 1826; 2147; 2202; 2207; 2292; 2441; 2451; 3693; 4097; 4593; 4949-51; 6611); diminished stamina (*Id.* at 1824; 2180; 2439; 2637); and fatigue (*Id.* at 1819; 2432).

**32.**     Abnormal clinical findings of Chung's upper extremities include decreased left upper extremity strength (*Id.* at 310-13; 486; 1538-39; 1658; 2147; 2202; 2207; 2451; 3693; 4593; 4949); decreased left shoulder range of motion (*Id.* at 310; 312); positive left wrist Phalen Sign (*Id.* at 310-13; 486; 1538-39; 1658; 2147; 2202; 2207; 2451; 3693; 4593; 4949); bilateral upper extremity weakness (*Id.* at 4951; 6611); bilateral upper extremity tenderness/hypertonicity (*Id.* at 6611); decreased bilateral arm sensation (*Id.* at 4951); decreased elbow extension strength (*Id.* at 6604); decreased finger abduction strength (*Id.*); bilateral postural hand tremor (*Id.* at 1819; 2292; 2432; 4095; 4100); left arm hyperesthesia to pinprick (*Id.* at 2292; 4100); decreased bilateral bicep deep tendon reflexes (*Id.* at 2293; 4095; 4100); increased bilateral triceps deep tendon reflexes (*Id.*); significantly below average grip strength (*Id.* at 1822; 2436); below average pinch grip strength (*Id.*); below average bilateral fine motor skills (*Id.*); below average bilateral gross motor and dexterity skills (*Id.*);

decreased bilateral bicep deep tendon reflexes (*Id.* at 2293; 4095; 4100); increased bilateral triceps deep tendon reflexes *(Id.)*; decreased bilateral shoulder range of motion (*Id.* at 1826; 2441); decreased bilateral elbow strength (*Id.* at 1827; 2442); decreased bilateral hand strength (*Id.*); decreased bilateral wrist strength (*Id.* at 2442); and deterioration of movements as tasks progress (*Id.* 1824; 2439; *see also* 2416-20).

33. Clinical findings also demonstrate abnormal tandem gait (6604; 6611), positive Romberg sign (*Id.* at 2292; 4100), and diminished reflexes in the lower extremities (*Id.* at 4095; *see also* 2293; 2700).

Treating Physician, Marc Levinson, M.D.

34. Dr. Levinson, Chung's treating physician, made the following conclusions regarding Chung's limitations:

    a. "[Chung] cannot sustain [a] position at the computer for extended periods."  *Id.* at 1706.

    b. "Upon examination, [Chung] must change position every 15 to 25 minutes, and he is unable to sit more than occasionally throughout the day (more than 15 to 20 minutes)." *Id.* at 2637.

    c. Chung can only sit for less than 2 hours total in an 8-hour workday, and he must rest lying down or reclining in the supine position for at least 3 hours during an 8-hour workday (*Id.* at 4873; 1930). Chung would require rest breaks every 20 to 30 minutes, but more frequently if typing/using a computer.  *Id.* at 1930-31.

    d. Chung's condition interferes with his ability to keep his neck in constant position (e.g., looking at a computer screen, looking down at a desk). *Id.*

at 1930.

e.  Chung is limited to using his fingers for fine manipulation for 1% to 5% of
    the day on each hand, and limited to using his arms to reach out 6% to
    33% of the day with each hand. *Id.* at 1931; 4874.

f.  Chung's condition deteriorates throughout a workday because "[Chung's]
    symptoms are aggravated with . . . performing gross motor/dexterity skills
    such as typing, reading and writing." *Id.* at 1925).

g.  Chung has "limited keyboard use." *Id.* at 1706.

h.  Chung's "pain and other symptoms are severe enough to interfere with his
    attention, concentration, and sleep quality, which would further limit his
    ability to perform the cognitive demands of his work." *Id.* at 1926.
    Chung's frequent need to change positions also "makes it very difficult
    for him to revisit complex tasks and focus, in addition to the distracting
    level of his pain." *Id.* at 2179.

i.  "Chung would require an inordinate amount of rest breaks and positional
    changes throughout a typical workday, in addition to normal meal and
    restroom breaks." *Id.* at 1925.

35.  Dr. Levinson concluded that no possible work accommodations would
enable Chung to return to work. *Id.* at 1926. He ruled out the following possible
accommodations:

a.  "Use of a sit/stand desk would still require him to keep his neck in a static
    position to use a computer screen, which he cannot do without significant
    pain." *Id.* "The neck position necessary for Chung to view a computer

screen aggravates both his pain and the numbness/tingling symptoms. This is the case regardless of whether he is sitting, standing, taking breaks, or stretching at will." *Id.* at 2179.

b. "Simply moving [Chung's] head/shoulders as needed and/or take brief stretch breaks would not eliminate his pain nor enable Chung to perform his work. If that were the case, I would have considered recommending a return to work with accommodations to alternate positions at will. It is inappropriate for this patient." *Id.*

c. "No accommodations could adequately account for [Chung's] poor fine motor skills, grip, and dexterity, which affect his ability to type." *Id.* at 1926. "Engaging in position changes at will, such as alternating sitting/standing/stretching, will not address or improve Mr. Chung's significant deficits in fine motor skills and dexterity. These deficits alone would reasonably prevent him from typing/writing efficiently and accurately for his work." *Id.* at 2180.

d. "Alternating between sitting/standing/stretching is not enough. Mr. Chung must also frequently take unscheduled rest breaks where he is able to lie down." *Id.* at 2180. Dr. Levinson indicated that Chung would need to rest lying down or reclining for at least three hours in an 8-hour workday. *Id.* at 4873. Dr. Levinson also assessed that Chung would likely be absent from work more than four days per month. *Id.* at 1931; 4874.

Neurologist, Igor Stiler, M.D.

36. On December 2, 2019, Chung underwent a neurological medical

examination by Igor Stiler, M.D., a board-certified neurologist. *Id.* at 2291-94; *see also* 2699-701; 4089-103. Dr. Stiler reviewed various medical records, including MRI scans and Chung's 2019 FCE, and conducted a clinical examination.

37.    Dr. Stiler made the following findings:

a.    "Examination of the cervical spine revealed C3-T1 tenderness with a palpable muscle spasm." *Id.* at 4095. "There was interscapular tenderness with spasm present as well." *Id.* at 2292.

b.    "Right lateral rotation of [Chung's] head went to 45 degrees and left lateral rotation of his head went to 50 degrees. This was immediately concerning because normally one should be able to rotate their head 80 degrees." *Id.*

c.    Flexion and extension of the head went to 40 degrees. However, normal flexion of the head is 50 degrees and normal extension is 60 degrees." *Id.* at 4095 ¶56; *see also id.* at 2292.

d.    "Mr. Chung [exhibited] pain during range of motion testing. He grimaced and guarded at times during my examination." *Id.* at 4095.

e.    "I observed a postural tremor on both hands that was worse on the left side." *Id.*; *see also id.* at 2292-93.

f.    "[P]ositive Romberg sign." *Id.* at 2292.

g.    "The sensory examination revealed hyperesthesia to pinprick and light touch sense involving the left arm diffusely." *Id.* at 2292; *see also id.* at 2700.

38.    Based on his review and examination, Dr. Stiler concluded:

> Mr. Chung should be considered Totally and Permanently Disabled
> from carrying out activities of his profession as an attorney and partner in
> a law firm. He is not capable of performing sedentary work or any work
> requiring prolonged computer usage. Objectively, the diagnostic
> studies have shown a progressive deterioration and clinically to a
> reasonable agreement of neurologic certainty, Mr. Chung's deficits will
> continue to worsen. He will require further treatment. He is also likely
> to require in the future surgical intervention with spinal cord
> decompression. *Id.* at 2294.

39.     Dr. Stiler confirmed that his examination findings correlated with the

findings and conclusions of the FCE. *Id.* at 2294. He additionally stated that that "the physical

demands of Mr. Chung's occupation would aggravate his condition, and that Chung's

"distracting pain and fatigue further erodes his capacity to function in his own occupation,

where the cognitive demands were very high." *Id.* at 4098. Dr. Stiler stated:

> For Mr. Chung to slow further progression of his condition, he must
> avoid all activities that aggravate his condition, including prolonged
> static positioning of his spine. The long and unpredictable hours Mr.
> Chung's occupation required at a desk would make his job especially
> hard to perform, even if given the opportunity to alternate sitting and
> standing." *Id.*

Functional Capacity Evaluations

40.     Chung's underwent two Functional Capacity Evaluations ("FCE"). *Id.* at

1801-33; 2405-49. The FCEs were each performed over two days by Susan Greenberg, MS,

PT ("PT Greenberg") on March 14 and 15, 2019 ("the 2019 FCE"), *id.* at 1801-33, and on

February 11 and 12, 2020 (the "2020 FCE"), *id.* at 2405-49.

41.     After both the 2019 FCE and the 2020 FCE, PT Greenberg concluded:

> Mr. Chung is unable to perform his own occupation of Attorney/Partner
> specializing in Mergers & Acquisitions (M&A) at this time due to the
> large discrepancy between his current functional abilities and the
> critical/essential job demands. . . . He is also not able to tolerate an 8-
> hour work day (or even half-day) due to positional intolerances in
> sitting (and also standing to a lesser degree), increased fatigue,
> deterioration of movements as tasks progress, and poor musculoskeletal

15

and cardiorespiratory endurance. *Id.* at 1824; 2439.

42.     The FCE results demonstrate restrictions and limitations consistent with the findings of Drs. Levinson and Stiler, including:

   a.  Chung can only sit for 6% to 33% of the day due to increased symptoms of neck and bilateral shoulder pain. *Id.* at 1833; 2448.

   b.  Chung fatigues easily, especially when sitting statically, and must change position frequently (every 15 to 25 minutes for sitting at the onset, then every 15 to 20 minutes). *Id.* at 1819; 2432.

   c.  Chung has significantly diminished fine motor skills, gross motor skills, and strength in his hands/upper extremities. *Id.* at 1811; 1819; 1822; 1833; 2432; 2436; 2439; 2449.

   d.  Chung's easy fatigability and poor endurance are documented throughout both the reports. *Id.* at 1801; 1810; 1817; 1819; 1824; 1833; 2413-15; 2430; 2432; 2439; 2449.

43.     The FCEs additionally show that limitations of Chung's upper extremities further deteriorated between 2019 and 2020. Between the two FCEs, Chung's lifting decreased by 36%; front carry decreased by 27%; bilateral side carry decreased by 34%; right hand tip and key grip decreased by 27%; right hand Jamar grip test decreased by 27% in position 2 and 43.6% in position 3; left hand Jamar grip test decreased by 40.7% in position 2 and 49% in position 3. *Id.* at 2421-28.

Dr. Daniel Rosenberg's Independent Medical Examination

44.     Chung was examined at Unum's request on March 10, 2020, by Dr. Rosenberg, Board Certified by the American Board of Physical Medicine & Rehabilitation, and a

16

Diplomate of the American Academy of Pain Management. *Id.* at 2586. An "IME Watchdog" retained by Chung to observe the IME was present. Dr. Rosenberg's examination took 12 minutes.

45.    Dr. Rosenberg noted that Chung's prior job as an attorney included performing mergers, acquisitions, meetings, desk work, documentation review, computer work, and phone calls. *Id.* at 2587.

46.    On examination, Dr. Rosenberg found the Spurling maneuver negative, straight-leg raise negative, Hoffman's sign negative, range of motion in both upper extremities normal; strength in both upper and lower extremities 5/5, and a non-antalgic gait. *Id.* He found cervical range of motion to be normal. *Id.* at 2588.

47.    Dr. Rosenberg gave an impression of cervical spondyloarthropathy *Id.* Dr. Rosenberg stated that there was no objective evidence of cervical or lumbar radiculopathies to support Chung's subjective complaints of cervical and lumbar pain and dyesthesia in upper and lower extremities, and that there is no evidence of a myelopathy. *Id.* He stated that the cervical MRI scan findings are compatible with his age group noting mild to at most moderate cervical spondyloarthropathy. *Id.* at 2588.

48.    Dr. Rosenberg stated that Chung was able to sit consistently, and with accommodations of the ability to move 5 minutes every hour and stretch. He opined that Chung could do computer work on no more than a frequent basis. *Id.* at 2589.[4]

49.    Dr. Rosenberg concluded that Chung did not have "restrictions and

---

[4]    Dr. Rosenberg does not define "frequent" in his report. However, Provident Life's vocational expert defined "frequently" as "exist[ing] from 1/3 to 2/3 of the time (2.5 - 5.5 hours a day in an 8-hour workday." R. 2613.

limitations that would preclude him from performing occupational demand that he had been performing prior to 1/01/19 when he was working on less than a full time basis." *Id.* at 120. He stated that "[t]here is no evidence of any specific pathology necessitating an inability to work." *Id.* at 2589.

50.     Dr. Joseph Antaki, M.D., reviewed the record on behalf of Provident Life and determined that Chung's restrictions and limitations were uncertain because of the difference in recorded strength symptoms and examination findings between the FCE, Dr. Levinson's records, and the IME. He suggested a referral back to Dr. Rosenberg. *Id.* at 2617.

51.     The February 2020 FCE, physical therapy notes, and Dr. Levinson's March 3, 2020 office notes were forwarded to Dr. Rosenberg for consideration along with Dr. Antaki's comments. *Id.* at 2652. Dr. Rosenberg stated these records did not change his opinion that Chung "did not have restrictions or limitations that would preclude him from performing the occupational demand that he had been performing prior to 1/01/19." *Id.* at 2653.

52.     The IME Watchdog issued a report dated March 31, 2020, documenting the IME.  The report included descriptions of the exam's duration, the intake process, and the examination itself. *Id.* at 2626.

53.     Chung submitted an affidavit and the report of the IME Watchdog raising several challenges to the reliability of Dr. Rosenberg's report.  Chung criticized Dr. Rosenberg for the alleged brevity of his twelve minute examination, his failure to use a goniometer when measuring range of motion of the lumbar spine, and his purported lack of review of the records.

54.     Dr. Stiler and Dr. Levinson each commented that Dr. Rosenberg could not have conducted all relevant testing nor completed a thorough examination in 12 minutes, *id.* at 4102-03, 2707.  Dr. Antaki commented that Dr. Rosenberg's examination was appropriate. *Id.*

at 2636.

55.    Chung and the IME Watchdog criticize Dr. Rosenberg for not using a
goniometer to measure Chung's range of motion; Dr. Rosenberg contended that he did use a
goniometer. *Id.* at 2622-30.   Dr. Levinson, comparing Dr.Rosenberg's opinion to prior
examinations in 2019 and 2020 where goniometers were utilized, found Dr. Rosenberg's range
of motion findings were "highly inconsistent [with] the prior measurements." *Id.* at 2707.

56.    Chung and the IME Watchdog claim that Dr. Rosenberg did not review
Chung's MRI films, unlike Drs. Levinson, Stiler, and Chaudhary.   *Id.* at 2323-25.   Dr.
Rosenberg's initial report does not state what records he reviewed, *id.* at 2586-90, and Dr.
Rosenberg's addendum report, prepared at Chung's request, shows that Dr. Rosenberg did not
review the complete record. *Id.* at 2652-53.  Dr. Stiler stated:

> In this kind of case, a review of all medical evidence, especially the
> diagnostic films, is especially important. This evidence shows progression
> of Mr. Chung's disease over time, which Dr. Rosenberg fails to
> acknowledge. This is not just useful for determining Mr. Chung's
> symptoms at a given time, but also can serve as a roadmap for how his
> condition will progress in the future. *Id.* at 4102-03.

57.    Several of Dr. Rosenberg's clinical findings cannot be reconciled with the
findings of other examining physicians.  For example:

      a.    Dr. Rosenberg found that "[t]he neurological evaluation was within normal
limits[,]" *id.* at 2651, while Drs. Levinson and Stiler found abnormal
reflexes, including in the biceps, triceps, and ankles. *Id.* at 4880; 2292-93.

      b.    Dr. Rosenberg found Chung's cervical range of motion to be "normal in all
planes[,] *id.* at 2588, contrary to the decreased cervical range of motion
found by Drs. Levinson and Stiler and both FCEs. *See id.* at 313; 486;

1538; 1826; 2292; 2242.

c.  Dr. Rosenberg found Chung's range of motion and strength in upper extremities to be normal, *see id.* at 2587, while Dr. Levinson and the FCEs found decreased shoulder range of motion and decreased upper extremity strength. *See id.* at 310-313; 1826; 1658; 2207; 1826-27; 2441-42.

d.  Dr. Rosenberg found "[n]o tenderness is elicited with loading or palpation of the cervical facet joints[,] *id.* at 2588, while Drs. Levinson and Stiler found right interscapular tenderness and tenderness at C5-C7 and C3-T1. *See id.* at 486; 1538-39; 6604; 4095.

e.  Dr. Rosenberg's concluded that there was "no clinical evidence of a cervical radiculopathy," *id.* at 3715, while Dr. Stiler stated that the EMG "shows significant abnormalities and serves as objective evidence of radiculopathy." *Id.* at 4140.

f.  Dr. Rosenberg stated that "cervical MRI scan findings are compatible with [Chung's] age group" and that "there is no evidence'" of any pathology. *Id.* at 2588.  Dr. Stiler stated that "Mr. Chung's condition is in no way normal for his age group (Chung is 53)" and that "[t]o a reasonable degree of medical certainty, it is inconceivable to consider a finding of multilevel multi-level disc osteophyte pathology  with spinal cord flattening and severe foraminal stenosis as 'normal for the age group' of Mr. Chung." *Id.* at 2700; 4101.

**The Vocational Evidence**

Reports of Daniel Wolstein

58.     Plaintiff submitted a June 20, 2019, Vocational Evaluation Assessment, December 28, 2020 Labor Market Survey, and June 21, 2021 Addendum prepared by Daniel Wolstein, Ph.D., CRC, CVE.  *Id.* at 1950-87; 4086-88; 6291-95.

59.     Dr. Wolstein conducted an interview of Chung regarding his education and past and present employment, and researched this information using standard vocational reference materials.  *Id.* at 1955.  He identified those references as the US Department of Labor's Dictionary of Occupational Titles (the "DOT") and addendum publications that included the Revised Handbook for Analyzing Jobs.  *Id.* at 1958.

60.     Dr. Wolstein determined that the DOT title of "Lawyer" and "Lawyer, Corporation" represented the "modal ability levels associated with the types of jobs Mr. Chung has performed in the past."  *Id.* at 1959.  The DOT classifies the physical demands of these occupation titles as "sedentary."  *Id.*

61.     Dr. Wolstein evaluated the requirements of Chung's occupation as an attorney, but noted that "[a]dditional requirements and aptitudes must be noted to encompass accurately Mr. Chung's Partner-level responsibilities at a major international law firm and in his specialty area of practice in M&A."  *Id.* at 1962.  Dr. Wolstein identified the following requirements of Chung's occupation:

    a.  "Chung's specialty area of practice required very substantial computer usage with prolonged static positioning of the neck and typing at a keyboard."  *Id.*

    b.  "[Chung] spent most of his time in an office at his desk while typing and reviewing material on his computer screen."  *Id.*

    c.  "[Chung] was required to engage in business and client meetings, many

of which were lengthy in duration and conducted in person." *Id.*

    d.   "[Chung'] area of practice requires substantial document review and revisions with exceptional attention to detail. Small errors could have disastrous financial consequences." *Id.*

    e.   "[Chung's] area of practice requires high-level cognitive demands allowing him to perform complex analytical thinking, work efficiently, digest complex financial and contractual documents, multitask, and sustain concentration and focus for extended durations. The work has to be performed efficiently and expeditiously to maintain business and profitability in an extremely competitive field." *Id.*

    f.   "At the Partner-level, Mr. Chung had additional responsibilities to cultivate and maintain strong relationships with clients to contribute to the firm's profitability. He also was required to supervise the work of more junior-level attorneys and be the leader of the legal team on transactions." *Id.* at 1963.

    g.   "At a major international law firm, such as Mr. Chung's firm, clients may be internationally based. This requires coordination and communication with clients and counsel working in different time zones, often late at night or very early in the morning." *Id.*

    h.   "The occupation typically requires long hours in excess of 40 hours per week. The occupation frequently required late-night and weekend work to meet contractual deadlines and client expectations[.]" *Id.*

**62.**    Dr. Wolstein's reviewed Chung's medical records and reached the

following conclusion:

> Based on the medical records, Mr. Chung has significant physical functional impairments that impact his employability and functional abilities to perform work. The functional capacities evaluation indicates that he would not be a candidate for return to work, even at the sedentary level, due to his inability to lift up to 10 lbs. for an 8-hour work-day; his inability to sustain positional requirements, including the inability to sit or stand at a computer for an 8-hour work-day (or even half day); and his inability to use his hands and position his neck to use a computer on a consistent, sustained, and prolonged basis. The medical evidence also indicates that Mr. Chung's symptoms, including pain, are severe enough to interfere with his attention and concentration, which would further impact his ability to perform the high-level cognitive demands of his occupation. Mr. Chung will not be a candidate for return to work unless his medical condition improves.

*Id.* at 1973.

Report of Andrea L. Coraccio

      **63.**    On March 26, 2020, Andrea L. Coraccio, a Senior Vocational Resource Consultant ("VRC") with Unum reviewed the duties performed by Chung and determined that his occupation in the national economy was "attorney." *Id.* at 2613-2614. Ms. Coraccio cited the Enhanced Dictionary of Occupational Titles (eDOT), PAQ Services, Inc., and The Revised Handbook for¯ Analyzing Jobs, published by the Department of Labor Employment and Training Administration 1991. *Id.* at 2614.

      **64.**    Ms. Coraccio identified the duties and physical and cognitive demands of an attorney. She stated:

> As performed in the (northeast), the occupation is Attorney, eDOT# 110.117- 022, which involves advising, consulting, litigating and performing trial work and carrying out the legal processes necessary to effect the rights, privileges, and obligations of the organization.
>
> . . .
>
> Physical Demands
> Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 Lbs. occasionally.

. . .

Insured reports extended periods of sitting at meetings and working at desk for long periods without breaks. Use of a computer for reading, searching, document preparation/technical writing. Insured could move his head and shoulders, do stretch activities while reading information on the computer and talking on the phone and could take brief stretch breaks throughout the day.

. . .

Cognitive Demands: Directing, controlling, or planning activities of others

Influencing people in their opinions, attitudes, and judgments Making judgments and decisions. Dealing with people.

*Id.* at 2613.

65.     Ms. Coraccio then compared Chung's reported restrictions and limitations with the occupational demands of the occupation of "attorney" and concluded Chung could perform those duties as he had done before he stopped working in January 2019, since he would be able to take a 5-minute break every hour to stand and stretch without disrupting his productivity.  Computer work would not exceed frequent use throughout the workday.[5]  *Id.* 2613.

Report of Mary Cloutier

66.     On April 27, 2021, Mary Cloutier, a Senior VRC with Unum reviewed the vocational evidence and prepared a report.  *Id.* at 4921.

67.     Ms. Cloutier stated her opinion that the Supplemental Plan did not insure for how work tasks are performed for a specific employer or at a specific location, and that Mr. Wolstein description of Chung's "senior status as a partner at a prestigious international law

---

[5]     Ms. Coraccio's report defined "frequently" as "exist[ing] from 1/3 to 2/3 of the time (2.5 - 5.5 hours a day in an 8-hour workday." *Id.* at 2613.

firm" working across times zones with international clients, and an expectation that he be available "24/7" are not relevant, as these are job specific for a specific employer. *Id.* at 4923.

68.     Ms. Cloutier explained that when analyzing occupations in the national economy, Unum utilizes Enhanced Dictionary of Occupational Titles ("eDOT") which includes the data from The Dictionary of Occupational Titles along with 35 Selected Characteristics of Occupations (SCOs), which measure characteristics such as the frequencies keyboard use, sitting, standing, and walking, and mental/stress demands not found in the DOT. The eDOT incorporates the DOT data, employer provided data, and a limited amount of employee-provided data. *Id.*

69.     Ms. Cloutier stated that these resources, along with nationally accepted resources such as the O*NET and Occupational Outlook Handbook are the standard for vocational analysis of an occupation as it is normally performed in the national economy.  Dr. Wolstein used these same resources. *Id.* 37. Ms. Cloutier noted that these resources do not contain descriptions for "mergers & acquisitions attorney" or "partner." *Id.*

70.     Ms. Cloutier noted that VRC Coraccio determined Chung's economy was "attorney" utilizing the eDOT. *Id.* Ms. Cloutier claimed that although Mr. Wolstein included this same title, "attorney", he supplemented the national economy job description with job-specific characteristics that do not match the definition of occupation according to the Supplemental Plan. *Id.* at 4924.

71.     Ms. Cloutier stated that part-time opportunities for attorneys exist in the national economy and identified several such positions she found through her labor market research, including a remote part time Senior Corporate Counsel position and remote Corporate Transactional Attorney positions.

72.    Ms. Cloutier concluded that the vocational analysis by Dr. Wolstein contained some aspects of national economy analysis but became too specific and ventured beyond the Supplemental Plan's definition of "occupation." *Id.* at 4925.

## CONCLUSIONS OF LAW

1.     This case is brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 et seq. Plaintiff filed a two-count Complaint seeking a declaration of entitlement to benefits under 29 U.S.C. 1132(a)(1)(B) and for attorney's fees under 29 U.S.C. 1132(g). This court has jurisdiction pursuant to 29 U.S.C. 1132 (e)(1).

2.     Venue is proper as plaintiff resides in the Southern District of New York and the alleged breaches took place in this District.

### Standard of Review

3.     The parties have stipulated that the standard of review is *de novo*. The parties further agreed to resolution of this dispute by a bench trial pursuant to Fed.R.Civ.P. 52.

4.     ERISA plaintiffs under a *de novo* review must establish the elements of their case by a preponderance of the evidence. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006).

5.     In a *de novo* review, no deference is given to the insurer's interpretation of the plan, analysis of the medical record, or conclusions as to the merits of the benefits claim. *McDonnell v. First Unum Life Ins. Co.*, 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013).  The Court "interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion." *Id.* (citations omitted).  The Court is "free to evaluate [the treating physician's] opinion in the context of any factors it considered relevant, such as the length and nature of [the] relationship [with the patient], the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." *Connors v. Connecticut Gen. Life Ins.*, 272 F.3d 127, 135–36 (2d Cir. 2001).

6.      In a *de novo* evaluation of a disability claim based on complaints of pain, "the subjective evidence of appellant's pain, based on her own testimony and the medical reports of examining physicians, is more than ample to establish her disability, if believed." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (citation omitted).

7.      On *de novo* review, the evidence is limited to the administrative record that existed before the plan administrator when the claim determination was made. *DeFelice v. American Int'l Life Assur. Co. of NY*, 112 F.3d 61, 66 (2d Cir.1997).   Where a district court exercises *de novo* review of a plan administrator's decision, it should not accept additional evidence absent "good cause." *Id.*   The parties have submitted relevant portions of the administrative record, discussed in the findings of fact above.   Part of plaintiff's submission includes records and reports of Dr. Christopher Ilacqua.   R. at 6602-6608; 6609-6611.   These were submitted to Provident Life on October 28, 2021, after Provident Life issued its final claim determination on October 11, 2021.   *Id.* at 6498.   They were not part of the administrative record considered when Provident Life issued its determination and are therefore not considered by this Court. *DeFelice*, at 66.

### Chung's Occupation is "Attorney"

8.      The parties dispute Chung's occupation within the meaning of the Supplemental Plan, which defines "Your Occupation" as "the occupation or occupations, as performed in the national economy, rather than as performed for a specific employer or in a specific location . . ." R. at 3785.

9.      Where a plan does not provide a definition, the term "occupation" "shall be a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Kinstler v. First Reliance Std. Life Ins. Co.*, 181

F.3d 243, 252 (2d Cir. 1999) (internal citation omitted). However, where a plan provides a definition, that definition controls. See *Hinchey v. First Unum Life Ins. Co.*, No. 17-CV-08034 (NSR), 2020 WL 1331898, at *21 (S.D.N.Y. Mar. 20, 2020), aff'd, 848 F. App'x 481 (2d Cir. 2021) (insurer's definition controls where the Plan states that the insurer "will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for specific employer or at a specific location"). The Supplemental Plan's definition of "Your Occupation" therefore controls.

10.   Consistent with the information contained in the eDOT and other national-standard resources, Chung's occupation in the national economy is "attorney."

11.   The physical demands of an attorney in the national economy, according to the eDOT, are "mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 Lbs. occasionally." R. at 2613. The cognitive demands identified by the eDOT are "[i]nfluencing people in their opinions, attitudes, and judgments Making judgments and decisions. Dealing with people." *Id.*

12.   The DOT has not been updated since 1991. *Thomas v. The Hartford Life Ins. Co. of Am.*, 2013 WL 53710, at *2 (S.D.N.Y. Jan. 2, 2013). The occupational requirements of attorneys in the national economy have changed since 1991, particularly regarding increased reliance on computer and keyboard usage, and there is no provision of the Supplemental Insurance policy to limit occupational requirements to those of 1991. The Court therefore declines to limit its view of Chung's occupational requirements to those specified by the DOT, and additionally considers the occupational requirements identified by Chung's vocational expert, Dr. Wolstein.

13.     Provident Life has asked the Court to disregard the reports and opinions of

Dr. Wolstein because he considered "[a]dditional requirements and aptitudes . . . to encompass

accurately Mr. Chung's Partner-level responsibilities at a major international law firm and in his

specialty area of practice in M&A." *Id.* at 1962.  However, the majority of the occupational

requirements identified by Dr. Wolstein apply to the general occupation of "attorney" without

regard to a specific employer or location of employment:

    a.   "very substantial computer usage with prolonged static positioning of the
neck and typing at a keyboard." *Id.*

    b.   "[spending] most of his time in an office at his desk while typing and
reviewing material on his computer screen." *Id.*

    c.   "engag[ing] in business and client meetings, many of which were lengthy
in duration and conducted in person." *Id.*

    d.   "substantial document review and revisions with exceptional attention to
detail." *Id.*

    e.   "high-level cognitive demands allowing him to perform complex
analytical thinking, work efficiently, digest complex financial and
contractual documents, multitask, and sustain concentration and focus for
extended durations." *Id.*

14.     None of the above requirements is specific to Chung's employer or

location.  The Court accepts them as requirements of Chung's occupation as performed in the

national economy.[6]

_____

[6]     The occupational requirements identified by Dr. Wolstein that the Court disregards as
specific to Chung's work as an M&A partner at a major international law firm are Chung's

## Chung is Totally Disabled

     **15.**    Chung has demonstrated by a preponderance of the evidence that he is "unable to perform the material and substantial duties of [his] Occupation," and is therefore Totally Disabled under the Supplemental Plan.

     **16.**    Chung is unable to sit at a desk or in meetings for prolonged periods or keep his neck in a static position for prolonged periods while viewing a computer screen. He also cannot type for prolonged periods. Finally, he is unable to perform the high-level cognitive demands of his occupation, including substantial document review, multitasking, and sustaining concentration and focus for extended durations. Chung cannot perform these duties even on a part-time basis.

     **17.**    These conclusions are supported by Chung's subjective reports of pain as well as objective medical evidence.

     **18.**    Regarding sitting for prolonged periods, the objective diagnostic testing, including repeat abnormal MRIs and X-rays of the cervical spine, and abnormal EMG of the upper extremities, establishes significant physical abnormalities of Chung's cervical spine that impair his ability to sit and view a computer screen. With the exception of Dr. Rosenberg, the medical professionals who have personally examined Chung have concluded that he is unable to sit for prolonged periods without experiencing serious pain. Dr. Levinson concluded that Chung must change position every 15 to 25 minutes, and he is unable to sit more than occasionally throughout the day. He also stated that in an eight-hour workday, Chung can sit for only two hours total, and must rest lying down for at least three hours. Dr. Stiler found that Chung is not

---

activities in cultivating and maintaining strong relationships with clients, working in excess of 40 hours per week, and coordinating with clients and counsel located in different time zones. R. at 1962. **Explain**

capable of performing sedentary work or any work requiring prolonged computer usage. The repeat FCEs indicated that Chung cannot tolerate an eight-hour workday, or even half-day, due to positional intolerances in sitting, increased fatigue, deterioration of movements as tasks progress, and poor musculoskeletal and cardiorespiratory endurance. The FCE reports also stated that Chung fatigues easily, especially when sitting statically, and must change position frequently.

19.     Regarding typing, diagnostic testing establishes significant physical abnormalities as to Chung's upper extremities. The 2019 EMG of the upper extremities revealed the EMG revealed "right C5-C6-C7 and left C7 radiculopathy." R. at 2299. Clinical findings include decreased upper extremity strength, dexterity skills, and reflexes. Dr. Levinson indicated that Chung is limited to using his fingers for fine manipulation for 1% to 5% of the day on each hand, and to using his arms to reach out 6% to 33% of the day with each hand. He opined that Chung's condition deteriorates throughout a workday because his symptoms are aggravated by performing gross motor/dexterity skills such as typing, reading, and writing. Dr. Stiler concluded that Chung's cervical radiculopathy causes pain/tingling, numbness, and weakness in his arms and hands. Finally, the FCE reports indicated that Chung has significantly diminished fine motor skills, gross motor skills, and strength in his hands/upper extremities.

20.     Regarding cognitive demands, Dr. Levinson reported that Chung's pain and other symptoms are severe enough to interfere with his attention, concentration, and sleep quality, which limit his ability to perform the cognitive demands of his work. He also noted that Chung's frequent need to change positions would make it even more difficult for Chung to revisit complex tasks and focus. Dr. Stiler stated that Chung's distracting pain and fatigue further erodes his capacity to function in his own occupation, where the cognitive demands are

very high.  Dr. Stiler concluded that the distracting pain and fatigue that Chung experiences,

particularly if forced to engage in aggravating sedentary activities, is severe enough to interfere

with his higher cognitive functioning, attention and concentration.

  **21.**  Provident Life has failed to rebut these conclusions.  Dr. Rosenberg, the

only physician to personally examine Chung on behalf of First Reliance, examined Chung for

only twelve minutes.  Furthermore, several of his clinical findings cannot be reconciled with the

findings of other examining physicians, and his claim that he used a goniometer is contradicted

by Chung's affidavit and the report of an IME Watchdog.  It is also significant that First

Reliance's physicians relied on radiological reports and did not review the MRI films, unlike

Chung's physicians.

  **22.**  Additionally, the Court gives particular weight to the opinions of Chung's

treating physicians.  "While there is no 'treating physician rule' under an ERISA *de novo* review,

the Second Circuit has suggested that factors such as 'the length and nature of [the patient-

physician] relationship, the level of the doctor's expertise, and the compatibility of the opinion

with the other evidence' may provide guidance to a Court evaluating competing medical

opinions."  *Graziano* at 32 (citing *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135–36

(2d Cir. 2001)); *see also Solnin v. Sun Life & Health Ins. Co.*, 2015 WL 6550549, at *11

(E.D.N.Y. Oct. 28, 2015) ("The Court finds the reports of the other doctors who examined

plaintiff at the request of Sun Life, like Dr. Moriarty, and those doctors who saw her only one

time, in comparison to Dr. Mauri's 36 times, even less persuasive."), *aff'd sub nom*, 672 F. App'x

121 (2d Cir. 2017).

  **23.**  Provident Life argues that Chung's evidence does not support finding a

decline in his functional capacity between 2018, when he reduced the hours of his work at

Simpson Thacher to enable transitions of his responsibilities to other attorneys, and his departure

from the firm in January 2019.  However, Chung has submitted repeat MRIs, X-rays, and

treatment notes clearly demonstrating that his condition continued to grow worse.  Moreover,

even if Chung had offered no evidence that his condition worsened between 2018 and 2019, he

has credibly stated, and Provident Life has failed to refute, that he continued working in a very

limited capacity—approximately two hours per day—in the second half of 2018 in order to

responsibly wind down his practice at Simpson Thacher.

      **24.**    Provident Life points to the fact that of Chung's treating physicians, only

Dr. Stiler diagnosed him with chronic cervical myeloradiculopathy.  R. at 4090.  They note that

Chung's main treating physician, Dr. Levinson, regularly diagnosed Chung only with "neck

pain" or "cervical spondylosis."  *Id.* at 1924.  However, Chung's claim does not depend on any

specific diagnosis.  *See Chicco v. First Unum Life Ins. Co.*, No. 20CV10593 (DLC), 2022 WL

621985, at *5 (S.D.N.Y. Mar. 3, 2022) (citing *Krizek v. Cigna Group Ins.*, 345 F.3d 91, 101–

02 (2d Cir. 2003)).  Chung "need only demonstrate that [his] condition causes [him] sufficient

pain to prevent [him] from performing her regular job duties. *Id.* Chung has made that

showing.

## CONCLUSION

For the reasons detailed above, I find that Chung has been Totally Disabled within the meaning of the Supplemental Plan since September 21, 2020.  The Court grants judgment in favor of Chung, awarding Chung Total Disability benefits from September 21, 2020 to the date of judgment.  Chung is entitled to Total Disability benefits after the date of judgment subject to the terms and conditions of the Supplemental Plan.  The Clerk shall terminate any open motions.  Provident Life is liable for attorney's fees and costs associated with this action pursuant to 29 U.S.C. § 1132(g)(1).  The parties, by September 19, 2023, shall propose a schedule to allow the Court to determine such fees and costs.

SO ORDERED.

Dated:     September 12, 2023
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge